UNITED STATES, Appellee

v

WALTER A. STURMOWSKI, Private E-1,
U. S. Army, Appellant

10 USCMA 86, 27 CMR 160

No. 11,750

Decided December 24, 1958

*First Lieutenant Neil Flanagin* argued the cause for Appellant, Accused. With him on the brief was *Captain John F. Christensen.*

*First Lieutenant Jay D. Fischer* argued the cause for Appellee, United States. With him on the brief were *Major Thomas J. Nichols, First Lieutenant Jon R. Waltz,* and *First Lieutenant Frank J. McGee.*

## Opinion of the Court

GEORGE W. LATIMER, Judge:

The accused stands convicted of escape from confinement and robbery. He was sentenced to a dishonorable discharge, total forfeitures, and confinement at hard labor for five years. The convening authority approved the findings and all portions of the sentence except he reduced the period of confinement to four years, and a board of review in the office of The Judge Advocate General of the Army affirmed. We granted the accused's petition for review to determine whether the law officer erred in refusing to submit to the members of the court-martial a requested instruction authorizing them to consider wrongful appropriation as a lesser included offense of the principal crime of robbery. A determination of that question depends primarily upon whether the evidence raises reasonably the included offense, and to place the issue in its proper perspective we relate the operative facts.

On the date in question, the accused was confined in the post stockade. During the course of the afternoon, he and an accomplice overpowered their guard and seized his shotgun. The accused armed with the weapon, covered the guard, marched him into a wooded area, and required him to disrobe and change his clothes with the accomplice. The guard was then ordered to lie on the ground face down, his hands were placed behind his back, and he was bound with his shoe laces. The accused took the guard's billfold and extracted $43, an identification card, driver's li-

cense, and other identifying papers. After stuffing two dollars in the pocket of the guard, the accused and his accomplice made off for freedom. Their plan failed for the reason that the guard was able to effect the release of his bonds within short order, the command was alerted, and approximately one hour after the commission of the crime the two offenders were apprehended. The accused was in possession of the $41, the weapon, and the five rounds of ammunition, which was the property he was alleged to have taken from the guard.

Approximately one week subsequent to the incident, the accused, after having been fully advised of his rights under Article 31, Uniform Code of Military Justice, 10 USC § 831, executed a written confession. We quote those portions which cast considerable light on his later contention that he was only borrowing the money. After relating the details of the prior planning and some of the events leading up to the actual disarming of the guard, accused explained his participation in the following language:

". . . At the time I grabbed him he had his finger on the trigger of the weapon and was trying to get a round into the chamber, but I managed to get my finger into the chamber of the weapon and my hand around the receiver preventing him from pulling the weapon all the way back. At the same time I threw him to the ground and TEDDER came over and helped me and we jerked

**87**

the weapon away from BOWEN. As soon as I got the weapon I put a round into the chamber and had the guard walk around the side of the cemetary [sic] into a wooded area. I made the guard, BOWEN take off his uniform and had TEDDER put it on giving BOWEN TEDDERS [sic] clothes. As TEDDER was putting the uniform on, I asked the guard if he had any money. He said that he had forty some dollars. I looked into his pockets and found the money and put it into my pocket. I wish to state that at the time of this incident, I had no intentions of robbing the guard, in fact I had not thought about him having any money until the time that TEDDER got the uniform. I took the billfold out of his pocket and removed his I D Card, drivers [sic] license Army shot record and Miscelleanous [sic] other papers and the money, which amounted to forty-three dollars ($43.00). I took forty-one dollars ($41.00) and left two dollars for the guard. At this time I made the guard put on TEDDERS [sic] fatigue uniform and laid a jacket on the ground and at this time I told TEDDER that I wanted him to take the guards [sic] boot laces and tie him up and if the guard started wrestling with him that I would shoot them both. I also told TEDDER that I did not care if he came with me or not. After TEDDER got the guard tied up we then left and crossed the road into a wooded area and ran until we came to a lake. We started crossing the clearing and heard a car coming and stopped beside of a car that was parked there. A few minutes later we were apprehended."

At trial the accused became a witness in his own behalf, and his testimony portrays him as a much more considerate offender than is shown in his pretrial confession. The conflict of importance is found in his assertion first made at trial that he informed the guard of his intent to return the money. Perhaps the strongest statement he makes in that regard is the following, "I told him at the time I would send the money back to him as soon as I got

someplace where I could get some from relatives."

In explaining his intention with respect to depriving the Government of the shotgun, he stated he was going to leave the weapon at some undetermined place where it could be repossessed. He was silent about the shells, but it is a fair assumption they were in the weapon and would be returned if unused and the weapon was found.

Based on the accused's testimony, defense counsel at trial requested an instruction on the lesser included offense of wrongful appropriation. Apparently the theory behind the request was that the accused intended to repay the money taken and, if that was his mental attitude at the time of taking, he could not be guilty of robbery as that offense is only committed when there is an intent to deprive the owner permanently of his property. The law officer refused the instruction for the assigned reason that the law of wrongful appropriation required the taker to return the identical property. His ruling was made before the decision of this Court in United States v Hayes, 8 USCMA 627, 25 CMR 131, which overruled our prior decisions in that field. Admittedly, under the present state of the law, the law officer's ruling cannot be sustained for the reason asserted, but unless the lesser included offense of wrongful appropriation is reasonably raised by the evidence, United States v Clark, 1 USCMA 201, 2 CMR 107; United States v Simmons, 1 USCMA 691, 5 CMR 119, this case need not be reversed.

In United States v Krawczyk, 4 USCMA 255, 15 CMR 255, the accused absconded with certain funds and, in a pretrial statement, claimed he intended to replace them when he received certain mustering-out pay due him. While the majority of the Court did not reach the question, Chief Judge Quinn, in his concurring opinion, held that the issue of wrongful appropriation was not reasonably raised. This case can well be governed by the rule used by the Chief Judge. We state that because the self-serving testimony of this accused is so hostile and contrary to his

criminal conduct and behavior at the time of the taking as to be inherently improbable and unworthy of belief. In addition, the contingencies surrounding any repayment are so indefinite, uncertain, and improbable that all reasonable persons would believe the accused was conditioning the return upon the happening of events which were so out of the ordinary they would not occur.

A reading of the pretrial statement and the testimony of the accused at the trial shows that not only did he rob the victim of his money by deliberately loading and using a death-dealing weapon, but he also threatened to kill both the guard and the accomplice if they did not fully cooperate with him in carrying out his illegal venture. He asserts he did not consider robbing the guard until he noticed the money and that it was a spur of the moment decision; yet after the passage of some days, during which time he could engage in mature deliberation, he comes forward with the story that, while he was in the act of perpetrating this spur of the moment armed robbery, he formed the intent to make the guard whole by subsequently repaying the money which he was forcibly taking. The intent with which we deal is that mental condition present at the time of the offense and it seems incredible to us that an accused would arm himself and strip a victim of all his belongings, and then threaten to kill, while at the same time entertaining an honest intent only to borrow the property. Had he killed the guard, he would have encountered some difficulty in returning his ill-gotten gains and such force is hardly compatible with a temporary seizure of goods. Of course, accused's story could never be rebutted by the prosecution because he was apprehended before he could get off the base. But, aside from its own inherent improbability, it is further discredited by the testimony of the guard who recalls his conversation with the offenders, but does not remember any statement made by the accused concerning the return of the money. While we recognize we are not triers of fact, we are permitted to consider evidence to determine whether it frames an offense, and here accused

seeks to convince us that wrongful appropriation is in issue. Such could only be the case if there is credible evidence to require that the law officer submit the issue to the court. From what we have said and in the light of a total absence of any evidence to corroborate accused's testimony, we believe every reasonable person would conclude he presents an incredible story which is unworthy of belief. United States v Mardis, 6 USCMA 624, 20 CMR 340; United States v Brown, 6 USCMA 237, 19 CMR 363; United States v Archibald, 5 USCMA 578, 18 CMR 202.

Even assuming a reasonable person would accept accused's testimony at face value, the conditions he placed on the return are so doubtful, indefinite, and uncertain that his asserted intent to make restitution was no more than a forlorn hope. It is to be noted that reimbursement was predicated on his reaching freedom, contacting relatives who would loan him money, obtaining funds from them, and disclosing his whereabouts by using the mail. There was no intent expressed to repay in all events, as return of the money was necessarily dependent upon the generosity of some undesignated relative. Whether there was a fair probability that the accused had relatives who were in a position to advance him money or would do so if they had the funds is not shown. However, it is disclosed that unless a fugitive from justice could convince some beneficent soul to loan him the sum of $41 without hope of early reimbursement, there was no possibility the money would be repaid. That conclusion follows naturally for, by taking the money forcibly and by escaping from confinement, the accused was faced with prosecution for serious offenses which would no doubt result in his being without pay for a long period of time.

Finally, accused's contention at trial concerning his intent about the return of the weapon and shells must be classed with his other testimony. But, assuming it is credible, an intent to abandon may be the equivalent of an intent to deprive permanently. At best, accused's testimony shows he intended to leave the weapon some place where it

could be found by military authorities. He had it in his possession for over one hour and an opportunity to have dropped it along the way was readily available to him. He had loaded the weapon and threatened to use it on at least one occasion, and it is a fair inference that he retained it to aid in his escape. When he was apprehended hiding behind a truck, he was still in possession of this valuable aid to his plan and when or where it was to be left is purely a matter of speculation. Certainly, his actions indicate he intended to keep it as long as it was useful and undoubtedly it would have been discarded at a time and place which would not give a clue to his whereabouts. Moreover, in his pretrial statement he entirely overlooks notifying the investigator he did not intend to conceal the tools of his crime. And we find nothing in his acts, behavior, and statements prior to trial which remotely corroborates his belated story that he intended to leave the weapon in a convenient place for recovery. We, therefore, find no issue on wrongful appropriation of the property forcibly taken by the accused.

For the foregoing reasons, we find the law officer did not err in refusing an instruction on the included offense. Accordingly, the decision of the board of review is affirmed.

QUINN, Chief Judge (concurring in the result):

I concur on the ground that the accused's representations are inherently incredible. I disagree with the discussion regarding the indefiniteness of restitution. See United States v Griffin, 9 USCMA 215, 25 CMR 477, and my opinion in United States v Hatter, 8 USCMA 186, 23 CMR 410.

FERGUSON, Judge (dissenting):

I dissent.

32 CJS, Evidence, § 1031c, defines inherently incredible testimony as follows:

"c. Inherently Incredible or Impossible Evidence

"Established physical facts and circumstances may overcome evidence to the contrary, provided it is shown that such facts apply to the issues and that they permit no other conclusion.

"Evidence of physical conditions and circumstances from which certain facts may be inferred may be of sufficient weight to overcome oral testimony to the contrary, and evidence which is contrary to the physical facts, known physical laws, or general knowledge must be rejected as without probative force. However, physical facts and circumstances will be given probative effect only where the existence of such facts and their connection with the question at issue, is established or admitted; and proof of such nature cannot be construed to establish a particular conclusion as a matter of law unless the facts and circumstances lead to but one conclusion to the exclusion of all others."

I would view an accused's intent as putting in issue his frame of mind rather than as a circumstance circumscribed by physical facts. This Court is not possessed of fact-finding power. United States v Alaniz, 9 USCMA 533, 26 CMR 313. Under the definition of inherently incredible, supra, there is no evidence in the record before us which this Court could properly label as inherently incredible. So far as the accused's testimony as to the money is concerned, I am of the opinion that the credibility of his testimony was properly one for the triers of fact and consequently there should have been an instruction as to the lesser included offense of wrongful appropriation.

Accordingly, I would reverse the decision of the board of review.